## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

CHARLES SCHMALZ,  RONALD A.
KREGER, SR., KEVIN BLACK, JOHN B.
CANTY, IV, CHAD CONZONERE,
MICHAEL TROY CRAIN, BRAD
CRAWFORD, WILLIAM J. CRAWFORD,
JR., ALVERY L. EFFERSON, CHARLES
EFFERSON, ROBERT EVANS, JR.,
MICHAEL FERRIER, WAYNE GAGLIANO,
KEVIN M. JACKSON, DENNIS KNECHT,
JR., FRED KNECHT, JR., ROBERT
KREGER, RONALD A. KREGER, JR.,
ROY KREGER, SR., RYAN A. KREGER,
WILLIAM H. LYNCKER, III, SHANNON D.
MORAGAS, CHRISTOPHER POMES,
ALLEN J. RAIMER, JOHN C. ROBERTS,
GERALD J. SANDER, JR., DAVID A.
SEGRAVE, JR., DAVID A. SEGRAVE,
SR., AND MICHAEL A. SEGRAVE

VERSUS

TRANSOCEAN LTD., TRANSOCEAN
OFFSHORE DEEPWATER DRILLING,
INC., TRANSOCEAN DEEPWATER, INC.,
TRANSOCEAN HOLDINGS, LLC., BP,
P.L.C., BP PRODUCTS NORTH
AMERICA, INC, BP AMERICA, INC., BP
AMERICAN PRODUCTION COMPANY,
BP EXPLORATION & PRODUCTION,
INC., HALLIBURTON COMPANY,
HALLIBURTON ENERGY SERVICES,
INC., ANADARKO PETROLEUM CORP.,
CAMERON INTERNATIONAL
CORPORATION f/k/a COOPER-
CAMERON CORPORATION, MOEX
OFFSHORE 2007, L.L.C., AND MITSUI
OIL EXPLORATION COMPANY, LTD.

CIVIL ACTION NO.: 10-cv-1452

SECTION:

MAGISTRATE:

COMPLAINT AND CLASS ACTION

JURY DEMAND

## COMPLAINT AND CLASS ACTION COMPLAINT

Complainants Kevin Black, John B. Canty, IV, Chad Conzonere, Michael Troy Crain,

Brad Crawford, William J. Crawford, Alvery L. Efferson, Charles Efferson, Robert Evans, Jr.,

1

Michael Ferrier, Wayne Gagliano, Kevin M. Jackson, Dennis Knecht, Jr., Fred Knecht, Jr., Robert Kreger, Ronald A. Kreger, Jr., Roy Kreger, Sr., Ryan A. Kreger, William H. Lyncker, III, Shannon D. Moragas, Christopher Pomes, Allen J. Raimer, John C. Roberts, Gerald J. Sander, Jr., David A. Segrave, Jr., David A. Segrave, Sr., and Michael A. Segrave, appearing herein individually, and Charles Schmalz and Ronald A. Kreger, Sr.  ("the Named Class Representatives") appearing herein individually and in the alternative as representatives of the class of persons similarly situated as defined herein (the "Class" or the "Putative Class") (hereinafter collectively, "Plaintiffs"), bring this action against the defendants identified below, and aver as follows:

## THE PARTIES

1.

Plaintiffs are all persons of the full age of majority and citizens of Louisiana who reside within this district. Plaintiffs engage in the economic pursuit of commercial crabbers in and around the waters of the Gulf of Mexico and in the "coastal zone" (as that term is defined in 43 U.S.C. §1331(e)) (the "Coastal Zone"), and they hold Louisiana commercial fishermen's and crab trap licenses. As a result of the events described herein and below, they have suffered damages as are more fully described below. Pursuant to Rule 23 of Federal Rules of Civil Procedure, Plaintiffs Charles Schmalz and Ronald A. Kreger, Sr. appear in their own behalf and alternatively as representatives of that class of persons similarly situated as defined hereinbelow.

2.

Made Defendants herein are:

(a)   Transocean, Ltd., ("Transocean, Ltd.") a foreign corporation doing business in the State of Louisiana and within this district;

2

(b)     Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore"), a
        foreign corporation doing business in the State of Louisiana and within
        this district. Upon information and belief, Transocean Offshore employed
        some of the seamen that were assigned to the crew of the Deepwater
        Horizon;

( c)    Transocean Deepwater, Inc. ("Transocean Deepwater"), a foreign
        corporation doing business in the State of Louisiana and within this
        district;

(d)     Transocean Holdings, LLC. ("Transocean Holdings"), a foreign corporation
        doing business in the State of Louisiana and within this district;

(e)     BP, P.L.C., a foreign corporation doing business in the State of Louisiana
        and within this district;

(f)     BP Products North America, Inc. ("BP Products") a foreign corporation
        doing business in the State of Louisiana and within this district;

(g)     BP America, Inc. ("BP America"), a foreign corporation doing business in the
        State of Louisiana and within this district;

(h)     BP American Production Company ("BP American Production"), a foreign
        corporation doing business in the State of Louisiana and within this district;

(I)     BP Exploration & Production, Inc. ("BP Exploration"), a foreign corporation
        doing business in the State of Louisiana and within this district;

(j)     Halliburton Energy Services, Inc. ("Halliburton Energy"), a foreign
        corporation doing business in the State of Louisiana and within this
        district;

(k)     Halliburton Company ("Halliburton"), a foreign corporation doing business in the
        State of Louisiana and within this district;

(l)     Cameron International Corporation f/k/a Cooper-Cameron Corporation
        ("Cameron"), a foreign corporation doing business in the State of
        Louisiana and within this district;

(m)     Anadarko Petroleum Corp. ("Anadarko"), a foreign corporation doing
        business in the State of Louisiana and within this district;

(n)     MOEX Offshore 2007, LLC ("MOEX"), a foreign limited liability company
        authorized to do and doing business in the State of Louisiana and within this
        district. MOEX is, on information and belief, a wholly-owned subsidiary of Mitsui

3

Oil Exploration Company, Ltd.,  and

(o)     Mitsui Oil Exploration Company, Ltd. ("Mitsui"), a foreign corporation
        doing business in the State of Louisiana and within this district,

collectively referred to herein as "Defendants."

## JURISDICTION AND VENUE

3.

This Court has jurisdiction over this action pursuant to:

(1)     28 U.S.C.  § 1332, insofar as this is a civil action for damages between citizens of

        different states where the amount in controversy exceeds the sum of $75,000,

        exclusive of interest and costs;

(2)     28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value

        of $5,000,000 exclusive of interest and costs, and it is brought in the alternative as a

        class action by citizens of a State (Louisiana) that is different from the State where at

        least one of the Defendants is incorporated or does business;

(2)     28 U.S.C. § 1331, because the claims asserted herein arise under the laws of the

        United States of America, including the laws of the State of Louisiana which have been

        declared, pursuant to 43 U.S.C. § 1331 (f)(1) and 1333(a)(2), to be the law of the

        United States for that portion of the outer Continental Shelf from which the oil spill

        originates;

(3)     43 U.S.C. §1332(1), which extends exclusive Federal jurisdiction to the outer

        Continental Shelf;

(4)     33 U.S.C.§2717, which specifically gives this Court jurisdiction, regardless of the

        amount in controversy, as this matter arises from an oil spill and resultant damage

        which occurred within this district; and,

4

(5)   28 U.S.C.§1367, which allows this Court to exercise supplemental jurisdiction over the

pendant state-law claims which are so related to the claims over which the Court has

original jurisdiction that they form part of the same case or controversy under Article II

of the U.S. Constitution.

4.

Prosecution of this action in this district is proper under 28 U.S.C. § 1391(a)(2)

because all of the events and omissions giving rise to the claims asserted herein occurred in

this district.  Additionally, 33 U.S.C.§2717 specifically confers venue upon this Court

because this matter arises from an oil spill and resultant damage which occurred

within this district.

**FACTUAL BACKGROUND**
**Responsibility on the Deepwater Horizon**

5.

Upon information and belief, Transocean, Ltd., Transocean Offshore, Transocean

Holdings, and/or Transocean Deepwater (collectively "Transocean") owned the Deepwater

Horizon, a fifth-generation, ultra-deepwater, dynamically positioned, column-stabilized, semi-

submersible mobile offshore drilling unit ("MODU") and employed seamen assigned to the

crew of the Deepwater Horizon.

6.

The Deepwater Horizon was performing operations for lessees BP, P.L.C., BP

Products, BP American Production, BP Exploration, and/or BP America (collectively, "BP"),

Anadarko, MOEX, and/or Mitsui on the outer Continental Shelf approximately 41 miles

offshore of the state of Louisiana and 52 miles southeast of Venice, Louisiana, on Mississippi

Canyon block 252 ("the Macondo Prospect") on April 20, 2010.

7.

On information and belief, BP is the holder of approximately a sixty-five (65%) percent interest in a lease granted by the Minerals Management Service ("MMS"), a division of the U.S. Department of the Interior; further on information and belief, Anadarka owns approximately a twenty-five (25%) percent interest in the lease, and MOEX/Mitsui owns the remaining ten (10%) percent of the leasehold interest  (hereinafter, BP, Anadarka, and MOEX/Mitsui are referred to as the "Lease Defendants"). The lease allows the Lease Defendants to drill for oil and perform oil-production-related operations at the site of the oil spill. BP is, on information and belief, the designated operator of the venture, and on April 20, 2010, Transocean, BP, and the other Lease Defendants operated the Deepwater Horizon and were responsible for the oil well which is the source of the oil spill.

8.

Plaintiffs further aver that BP (as the lease operator), the other Lease Defendants, and/or Transocean (as the rig owner), on information and belief had key decision-making roles aboard the rig, established policies and operating procedures and protocols that were followed by those aboard the rig, and/or retained operating control on the rig.

9.

Further on information and belief, employees of Transocean, Halliburton, and BP (including on information and belief an Operator's Representative) were all on the rig at the time of the explosion. Thus, at all times material hereto, the Deepwater Horizon was drilling, but was not in production, and was owned, manned, possessed, managed, controlled, chartered, leased and/or operated by the Defendants named hereinabove.

**The Use of New Cement on the Deepwater Horizon**

10.

This matter arises from the explosion on and the burning of the Deepwater Horizon on April 20, 2010 and its subsequent sinking in the Gulf of Mexico on the outer Continental Shelf off the Coast of Louisiana on April 22, 2010.

11.

On information and belief, prior to the explosion, Defendants Halliburton and/or Halliburton Energy (collectively, "Halliburton") along with Transocean were cementing production casing, a procedure common to numerous well blow-outs over the last fourteen years. Further on information and belief, the cementing process was executed at the instruction and under the supervision of BP.

12.

According to Halliburton's post-accident statement, it had completed cementation of the final production string of casing about twenty (20) hours before the explosion occurred and had set the bottom (first) cement plug. However, the final (second) cement casing plug had not yet been set to cap the bore.

13.

On information and belief, Halliburton and/or Transocean (at the instruction and with the supervision of BP) improperly and/or negligently performed their duties in cementing the production casing, and as a result of this negligence and/or gross negligence, the primary and/or secondary cement casing failed

. 14.

Among other things, on information and belief, Halliburton, with the knowledge,

approval and/or supervision of BP and/or Transocean, used a new type of cement for the seal. On information and belief, the new cement was infused with chemicals and particularly with nitrogen designed to enable the cement to cure more quickly.

15.

However, also on information and belief, the chemicals in the new cement created a significant amount of heat which could thaw methane hydrate in the well and thus exacerbate kicks of methane gas into the riser.

16.

In addition, also on information and belief, the new cement was more difficult to use and required greater care on the part of Halliburton and Transocean employees in its mixing and application. Upon information and belief, the employees were not sufficiently trained in the mixing and application of this new cement and/or its use at the depths and at the stage of drilling in which it was used here.

17.

Further on information and belief, the decision to use the new cement was done in the interest of expediency without due regard for the ramifications of using the cement in the situation presented here and/or the lack of training given to employees regarding the use of the new cement.

18.

On information and belief, after the first plug was set with the new cement, the Deepwater Horizon experienced a "blow-back" or "blow-out." A "blow-back" or "blow-out" occurs when abnormal pressure accumulates inside the marine drilling riser and then methane and/or other gasses and/or oil surge as the gas and/or crude oil expands rapidly,

causing an explosion at the surface of rig platform. It is believed that the gas and/or oil ignited and exploded at the surface of the rig platform at approximately 9:53 pm CST on April 20th.

19.

To the extent that the actions, omissions, violations, negligence and/or gross negligence of Halliburton and/or Transocean (as supervised, monitored, managed, approved and/or controlled by BP) in using the new cement caused and/or contributed to an increase in heat and/or a methane gas kick, and/or to the extent that the surging gas led to a casing failure and/or otherwise caused or contributed to the fire and explosion at the surface and thus to the spill, Defendants are liable to Plaintiffs and the Putative Class.

**Regulatory and/or Other Violations Including Premature Mud Extraction**

20.

Alternatively, to the extent that the abnormal pressure was caused and/or exacerbated by drilling in violation of the lease and/or other statutory and/or regulatory violations by Transocean or the Lease Defendants, or any of them, Transocean and/or the Lease Defendants are liable for same.

21.

Alternatively, to the extent that Defendants' employees neglected to note the build-up of pressure inside the well in a timely manner, Defendants are liable for same. To the extent that the celebration on the rig or other matters including schedule deadlines diverted or lessened the attention of some employees, Defendants are liable for same.

22.

Also in the alternative, on information and belief, the Lease Defendants and/or Transocean removed and/or allowed the removal of the mud barrier before the final cement

plug was installed.  On information and belief, this decision was made by Defendants BP, Halliburton and/or Transocean in order to finish the job quicker and/or to minimize down time on the well, at the expense of Plaintiffs, the Putative Class, and Louisiana's ecosystem.

23.

To the extent that mud was improperly extracted before the new cement had fully set, and/or to the extent that the premature mud extraction weakened control over the well which caused and/or contributed to the explosion and thus to the spill, the Lease Defendants and/or Transocean are liable to Plaintiffs and the Putative Class.

24.

Plaintiffs further aver that on information and belief, removal of mud prior to setting the final cement plug is contrary to "good oilfield practice" as outlined in a MMS report prepared by WEST Engineering in 2003.

25.

On information and belief, there were other regulatory violations on the Deepwater Horizon, discussed below.

**Defendants' History of Safety and Regulatory Violations**

History Aboard the Deepwater Horizon

26.

The Lease Defendants, including BP (as the lease operator), Transocean (as the rig owner and the employer of many crew members), and/or Halliburton were not only responsible for supervising, monitoring, and managing the cement operations and the removal of mud on the Deepwater Horizon, but they were further responsible for compliance with federal regulations and for compliance with the safety and operations policies and

protocols of the various Defendants on the Deepwater Horizon. The Lease Defendants and/or Transocean, on information and belief, were also responsible for the required testing of the Blowout Preventer.

27.

Also on information and belief, the Lease Defendants and/or Transocean have had a poor safety record and a pattern of numerous prior regulatory violations and incidents as a result of their actions, inactions, negligence – this, despite the party to celebrate the Deepwater Horizon's safety record which was ongoing aboard the rig at the time of the explosion. Further on information and belief, the attention of some of Defendants' employees may have been diverted by the celebration.

28.

Plaintiffs specifically aver that the management and supervision, including compliance supervision, provided by BP, Transocean and their employees and agents on the Deepwater Horizon has been lacking for several years. Under the supervision of the Lease Defendants and Transocean, the U.S. Coast Guard issued citations to the Deepwater Horizon, on information and belief, for being an "acknowledged pollution source" approximately 18 times between 2000 and 2010.

29.

Plaintiffs further aver that, on information and belief, there have been numerous spills and incidents on the Deepwater Horizon in the past, including one serious incident in 2008 when 77 people were evacuated from the rig after it partially flooded, listed, and began to sink when a section of pipe was removed from the rig's ballast system. The incident occurred, on information and belief, due to Transocean's failure to follow procedures.

30.

Only weeks before the explosion, on information and belief, the Deepwater Horizon had experienced a significant kick of natural gas, causing it to be shut down due to fears of an explosion. Further on information and belief, methane gas kicks occurred more frequently in this particular oilfield than are normally experienced.

31.

On information and belief, BP was warned by MMS a few weeks prior to the explosion that BP should take extra precautions on the Deepwater Horizon in dealing with methane gas leaking from the well after BP had initially minimized the potential danger associated with methane gas leaks. On information and belief, MMS' warning was ignored.

<u>Defendants' Safety Record in General</u>

32.

In addition, on information and belief, a majority of the incidents that triggered federal investigations into safety and other problems on deepwater drilling rigs in the Gulf of Mexico since 2008 have involved Transocean rigs.   For example, on information and belief, Transocean was drilling for BP in 2006 when one of Transocean's Blowout Preventers failed due to "extended use without inspection/maintenance". Moreover, in 2005, also on information and belief, Transocean experienced a well leaking drilling fluid because of problems with the cement seal. Finally, also on information and belief, as to all four fires investigated by MMS on deep-water drilling rigs since 2005, all of the rigs were operated by Transocean.

**Backup Safety Systems**

The Blowout Preventer

33.

On information and belief, Defendant Cameron manufactured and/or supplied the oil

well's Blowout Preventer ("BOP") in conjunction with specifications, approval and/or

supervision provided by Transocean and/or the Lease Defendants. The BOP was owned

and/or possessed by Transocean and/or the Lease Defendants.

34.

The BOP is, on information and belief, approximately 40 feet tall, and it weighs about

450 tons; it is anchored at the source of the oil well, and it is intended to be a fail-safe device.

Its purpose is to automatically block the well and cut off the flow of oil and/or gas in the event

of an explosion.

35.

However, the BOP failed to shut off the well, and as a result, the rig burned until it

sank, and there were at least three breaches that leaked oil into the Gulf of Mexico.  One of

the three breaches has been remedied, but that has not stopped the flow of oil into the Gulf.

36.

On information and belief, Transocean acknowledged in a 2003 report by Earl Shanks

that the BOPs had poor reliability, resulting in (floating) drilling rig downtime which was

common, and costly, to Transocean.

37.

Further on information and belief, a 2004 engineering study for MMS revealed that few

of the newly designed devices could shear the heavy drill pipe used at maximum-rated

depths, revealing potential design and/or construction defects in the BOPs. Thus, Defendants were or should have been aware as a result of this governmental study over five years ago that the blind shearing rams might have difficulty cutting through high-strength drill pipe used in deep wells such as the one involved here, but Defendants took no action to test this particular ram or to remedy the problem.

38.

MMS Regulation 250.416(e) required the Lease Defendants to submit proof with the drilling application that the BOP which Defendants intended to use had enough power to be able to shear the drill pipe to be used on this well.

39.

On information and belief, not only did the Lease Defendants fail to submit such proof in contravention of federal MMS regulation 250.416(e), but their drilling application had no information at all on the BOP's blind shear rams' ability to shear the drilling pipe to be used on this well.

40.

On information and belief, the BOP at issue herein may have malfunctioned due to poor design and/or construction, specifically its inability to function at the depths involved herein and/or its inability to cut through the pipe used for this deep well.

41.

In the alternative, Plaintiffs aver the BOP may have malfunctioned because its blind shear ram was unable to cut through tool joints, or joints where sections of pipe are joined.

42.

It is believed the BOP in use at the Deepwater Horizon had not been fully and

adequately tested for its shearing capability at the depths and with the pipe and pipe joints involved herein.

43.

In the alternative, Plaintiffs aver that the BOP at issue here may have malfunctioned due to infrequent and insufficient maintenance performed by Defendants and/or blockage.

44.

Plaintiffs aver that the malfunction of the BOP could have been avoided by Defendants herein with appropriate design, construction, implementation, testing, and/or maintenance.

45.

Further on information and belief and in the alternative, the BOP was not equipped with remote-controlled and/or acoustically-activated shut-off switches, and/or there were no dual-activation and other double-redundancy systems - systems that, on information and belief, were available to Cameron and thus to the Lease Defendants and Transocean.

46.

On information and belief, if the Deepwater Horizon had these systems and/or if any of the available shut-off devices had operated properly and as intended without blockage at the depth at which this BOP was placed, the oil spill may have been prevented entirely and/or lessened.

47.

However, also on information and belief, the BOP on the oil wellhead did not have remote-controlled or acoustically-activated shut-off mechanisms, the oil well and/or rig did not have dual activation and double-redundancy systems, and/or the systems were otherwise defectively designed, constructed, tested, implemented and/or maintained.  Thus, Defendants

are liable to Plaintiffs and the Putative Class pursuant to the Louisiana Products Liability Act in addition to being liable for their negligence and other breaches.

<u>Other Safety Systems</u>

48.

On information and belief, the oil well and rig together had at least four levels of safety devices/systems to prevent the disaster which has now occurred. All four levels of safety devices, including the BOP, the "dead man" switch on the rig itself, the mud in the well (which on information and belief was prematurely extracted), and the unmanned robotic devices on the Gulf floor (which were used after the fact), failed to shut off the flow of oil and/or gas into the Gulf.

49.

Plaintiffs aver that Defendants were responsible for compliance with governmental regulations concerning said devices and were further responsible for their design, construction, implementation, maintenance, repair and operation, and are now responsible for their failure.

**The Actions, Inactions, Violations and Negligence of Defendants**

50.

The fire and explosion on the Deepwater Horizon, its sinking and the resulting oil spill were caused by the negligence and/or gross negligence of Defendants, which renders them liable, jointly, severally, and in-solido to Plaintiffs and the Putative Class for all their damages.

51.

Alternatively, on information and belief, the injuries and damages suffered by Plaintiffs and the Putative Class were caused, in whole or in part, by Defendants' violations of federal

and/or state statutes and regulations, including, but not limited to, regulations issued by MMS, OSHA and/or the United States Coast Guard, including the requirement to fully and sufficiently test the sub-sea BOPs at regular intervals and the requirement to refrain from mud extraction until the final cement plug was set.

52.

Defendants knew of the dangers associated with the ultra-hazardous activity of deep-water drilling and of cementing production casing, and on information and belief, failed to take appropriate measures to prevent damage to Plaintiffs, the Putative Class, and the marine and coastal environments and estuarine areas of Louisiana and the Gulf Coast as well as the Coastal Zone, where Plaintiffs and the Putative Class work and earn a living.

53.

Upon information and belief, BP and Transocean also vigorously opposed new safety and other regulations proposed as early as the late 1990's and as recently as last year by MMS,  the federal agency that oversees offshore drilling operations, including regulations that would have increased the frequency of tests required of BOPs. Further testing of BOPs was opposed by the oil drilling industry, on information and belief, because it is costly.

54.

Further on information and belief, some of the most recently proposed regulations had been prompted by a study of other accidents on oil rigs from 2001 to 2007. The proposed regulations included, on information and belief, the use of remotely-controlled acoustic switches or other back-up equipment as "an essential component of a deepwater drilling system." The acoustic systems were later criticized, again on the basis that they were too costly to the oil industry. A letter from BP Vice-President, Richard Morrison published on the

U.S. government website Regulations.gov states that BP did not support "the extensive, prescriptive regulations as proposed," but rather suggested that merely "voluntary programs...have and continue to be very successful."

55.

Had Transocean and BP not acted negligently and irresponsibly in resisting the proposed regulations and/or the implementation of the best safety equipment available, and had BP and Transocean acted proactively in:

(1)    implementing the safety standards suggested and the most effective safety equipment available;

(2)    fully testing and maintaining that equipment;

(3)    developing and implementing a safety and environmental management plan for the Deepwater Horizon and the oil well it serviced; and

(4)    fully implementing and complying with all safety policies and protocols,

Plaintiffs aver that this accident and its impact may have been avoided and/or lessened.

56.

In addition, considering the dangerous nature of the venture Defendants undertook, Defendants should have properly installed, operated, and maintained doubly-redundant safety mechanisms to assure that the flow of oil could be stopped immediately in the event of an emergency. Defendants should have also implemented tried methods to redress a spill in the event of a worst-case scenario such as this one.

**The Damage Caused by Defendants' Actions, Inactions, Violations and Negligence**

57.

As of May 12, 2010, more than three weeks after the explosion on and subsequent

18

sinking of the Deepwater Horizon, oil was still leaking, causing a massive oil slick ("the spill"). The spill reached from the Breton and Chandeleur Sounds to about sixty (60) miles off of Pensacola, Florida, and was within two miles of Louisiana's bayous by May 6th; it has now reached west of the Mississippi Delta, and east to Florida's Choctawhatchee Bay, and it includes federal waters seaward of Louisiana State waters in the vicinity of Timbalier Island.

58.

The spill is comprised, conservatively, of millions of gallons of oil based on satellite imagery of oil visible at the surface, not including subsurface oil. The reserves now subject to the leak are estimated to contain tens of millions of barrels of oil.

59.

BP originally estimated the oil was leaking at 1,000 barrels per day and then revised its estimate in public statements to 5,000 barrels per day. However, in response to higher estimates of leakage of up to 25,000 barrels of oil per day based on industry experts' estimates from satellite imagery (for example, 8.9 million gallons estimated by Dr. Ian MacDonald at Florida State University on April 28, 2010), BP did not refute those estimates but stated only that oil flow rate could not be metered but only estimated.

60.

On information and belief, in BP's permit filed with MMS, BP quoted a worst-case daily discharge of 163,000 barrels (or 6.8 million gallons of oil per day) including subsurface oil. BP's executives also have informed the House Energy and Commerce Committee that if efforts to stop the leak fail and structures around the leak are moved, the leak could reach 60,000 barrels per day (2.5 million gallons per day).

61.

The oil began to reach the Coastal Zone of Louisiana and possibly the Louisiana coast (documented by Associated Press photographs) on or about April 30, 2010. But in any event, oil was found on Louisiana's Freemason Island and North Island in the Chandeleur Islands off St. Bernard Parish on May 6, 2010, and it has continued to spread since then. Thus, it is now documented that the spill is detrimentally affecting Louisiana marine, coastal and estuarine areas and in particular, it is detrimentally affecting the crabbing and seafood industry in that area.

62.

Most oyster harvesting areas east of the Mississippi River (with the exception of Lake Borgne) and some areas west of the Mississippi River (harvesting areas 8, 9, 13,14 and 15, to date) have been closed. The closures will remain in effect indefinitely.

63.

The St. Bernard Parish fishing (and crabbing) areas have been closed, and the areas closed to fishing by the National Oceanic and Atmospheric Administration ("NOAA") were expanded on May 7th, again on May 9th, and again on May 12th. The closed area extends west to Timbalier Bay, southeast of Houma, and east to Choctawhatchee Bay, Florida.

64.

Although a special shrimp season was opened on Thursday, April 20, 2010 along the Breton and Chandeleur Sounds in an attempt to harvest mature white shrimp before the Sounds were impacted by the spill, on information and belief, much of the shrimp crop were juveniles which could not be harvested at the time. Further, the special shrimp season was closed on May 4, 2010 at 6:00 p.m. Also on information and belief, heavier concentrations of

oil have already begun to spread west of the mouth of the Mississippi River to the fishing, crabbing and shrimping areas located there.

65.

Plaintiffs further aver that, on information and belief, low-energy eco-environments such as Louisiana's marshes are significantly more vulnerable and have slower coastal/shoreline recovery rates than, for example, rocky coastlines because oil can sink below marsh surfaces and accumulate in marsh sediments; thus, Louisiana's marine and coastal environments will be more significantly impacted by Defendants' actions, inactions, violations and negligence.

66.

In addition, the market's perception of tainted seafood, including crabs, may affect demand for months to come, and may affect both supply and demand during the high time of the Baltimore/Chesapeake Bay crabbing season when Louisiana supplies Baltimore with thousands of bushels of high-quality crabs.  This has affected and will affect Plaintiffs' livelihoods and those of the Putative Class, and Plaintiffs and the Putative Class are entitled to recover for same.

67.

The spilled oil cannot now simply evaporate off of the surface of the water and, on information and belief, it is causing dangerous environmental contamination of large areas of the Gulf of Mexico and its shorelines, threatening Louisiana's sensitive wetlands and estuarine areas.

68.

In addition, BP's use of large quantities of dispersants, including Corexit 9500 and

Corexit EC9527A, to break up the oil at depths of up to 5,000 feet may have further environmental impacts as well as economic impacts upon Plaintiffs and the Putative Class. In particular, the dispersants in the quantities used may be harmful to the marine life in the Gulf waters, and the dispersed oil may be more toxic than the released oil itself. Further, the dispersants may also upset the ecological balance of the region's ecosystem so vital to the likelihoods of Plaintiffs and the Putative Class. For these reasons, on information and belief, the use of dispersants at deep-water levels was discontinued, but not before thousands of gallons of dispersant had been dumped into the Gulf waters, and it is still being used on the surface of the water.

69.

The oil spill has caused and will continue to cause loss of revenue to persons and businesses who are being prevented from using all or part of the Gulf of Mexico and Louisiana's Coastal Zone for diverse activities, including their livelihoods.

70.

There are many other potential effects from the oil spill that have not yet become known, and Plaintiffs reserve the right to amend this Complaint once additional information becomes available.

71.

This matter is filed on behalf of Plaintiffs individually and as representatives of the class of similarly situated persons as defined below. This class action is being brought pursuant to Rule 23(a), (b)(1) and (b)(3) of the Federal Rules of Civil Procedure.

22

## CLASS DEFINITION

### 72.

The Named Class Representatives, Ronald A. Kreger, Sr. and Charles Schmalz, hereby bring this action on behalf of themselves and all others similarly situated, who are members of the Class defined as follows:

> Any and all residents of the State of Louisiana engaged in the business pursuit of commercial crabbing in the State of Louisiana who hold the following licenses issued by the Louisiana Department of Wildlife and Fisheries as of April 20, 2010: (1) Commercial Fisherman's license; and (2) Crab Trap license.

### 73.

Excluded from the proposed Putative Class are:

1. The presiding judge and any other judge sitting in this matter for any reason;

2. Other court personnel connected in any way with the case;

3. Parents, siblings, spouses, children and grandchildren of any and all judges sitting in this case for any reason;

4. Defendants and their officers and directors; and

5. Any legal representative, successor, or assign of Defendants and their officers/directors.

## CLASS ACTION ALLEGATIONS

### Numerosity of  the class

### 74.

It is estimated that there are approximately 2,000 licensed crab fishermen holding commercial fishing and crab trap licenses issued by the Louisiana Department of Wildlife and Fisheries as of April 20, 2010 who sustained damage as a result of the facts described herein.  Thus, the proposed Class is so numerous that joinder is impractical.

75.

Further, the class will clearly number in excess of forty, the number held by the Fifth Circuit as sufficient to constitute a class.

76.

The disposition of the claims asserted herein through this class action will be more efficient and will benefit the parties and the Court. The Named Class Representatives, on behalf of the Putative Class, aver that the class is properly and easily ascertainable from the definition provided hereinabove and from the lists of licensed commercial fishermen who also hold crab trap licenses that can be provided by the Louisiana Department of Wildlife and Fisheries.

77.

The Named Class Representatives have indicated their willingness to participate in such a class if one is certified.

**Predominance of Common Questions of Fact and Law**

78.

There is a well-defined community of interest in that the questions of law and fact common to the Class predominate over questions affecting only individual Class Members and include, but are not limited to, the following:

a.  Whether Defendants, or any of them, caused and/or contributed to the fire, explosion and/or oil spill;

b.  Whether Defendants, or any of them, owned or had garde over the Deepwater Horizon and/or the BOP;

c.  Whether Defendants, or any of them, caused and/or contributed in any way to the failure of safety devices intended to stop the flow of oil in the event of an explosion;

24

d.  Whether Defendants negligently maintained and/or operated the Deepwater Horizon, the BOP, and/or any of the safety and other equipment;

e.  Whether the actions of Defendants, or any of them, were otherwise negligent, including any negligence in pre- and/or post-explosion operations;

f.  Whether Defendants were grossly negligent in any respect;

g.  Whether Defendants, or any of them, violated any federal and/or state statutes and/or regulations which caused and/or contributed in any way to the explosion, the spill and/or the damage;

h.  Whether Defendants, or any of them, failed to promulgate and/or implement sufficient safety standards and devices and/or failed to ensure the BOP could operate as intended;

I.  Whether the actions of Defendants, or any of them, after the explosion caused delays and/or whether Defendants otherwise failed to completely assist in the clean-up efforts due to their efforts to avoid liability;

j.  Whether Defendants, or any of them, negligently failed to take reasonable measures to contain the spill;

k.  Whether Defendants knew, should have known and/or could reasonably foresee that their actions and/or inactions would cause damage to Plaintiffs and the Putative Class;

l.  Whether Defendants, or any of them, are liable under La. C.C. arts. 2317 and 2317.1 or otherwise at fault for damage sustained by Plaintiffs and the Putative Class;

m.  Whether the fire, explosion and oil spill have caused environmental or other damage;

n.  Whether the fire, explosion and oil spill have caused economic damage to Plaintiffs and/or to the Putative Class;

o.  The type and amount of damages Plaintiffs and the Putative Class should receive in compensation.

79.

The Named Class Representatives, on behalf of the Putative Class, aver that because there is at least one common question of fact among the proposed Putative Class members,

the commonality requirement of F.R.C.P. art. 23(a)(2) is satisfied, particularly in view of the "low bar" that the Fifth Circuit has set for this prong of Rule 23(a).

## Typicality

80.

The Named Class Representatives and the Putative Class have all suffered from the actions, inactions, negligence, and breaches by Defendants and have all suffered similar harm as a result. The Named Class Representatives' claims are typical of those of the Putative Class, the legal theories are the same (liability under article 2317 and 2317.1, negligence, gross negligence, breaches of the Oil Pollution Act, Product Liability, violations of LOSPRA/tortious invasion of a public right), and the claims are all based upon the same series of events.

## Adequacy of Representation

81.

The Named Class Representatives will fairly and adequately represent and protect the interests of the members of the Putative Class because their interests are aligned with and do not conflict with the interests of the Putative Class they seek to represent. The Named Class Representatives have no claims antagonistic to those of the Putative Class. The Named Class Representatives have retained counsel competent and experienced in class actions and complex litigation.

## Superiority

82.

The Named Class Representatives, on behalf of the Putative Class, aver that a class action is superior to other available methods for the fair and efficient adjudication of this

26

litigation since individual litigation of the claims of all class members is impracticable. Class members are crab fishermen without the financial wherewithal to pursue individual litigation against huge, well-funded corporations such as BP and Transocean. Moreover, individual litigation presents a potential for inconsistent or contradictory judgments, and it is desirable to consolidate this action in one forum for purposes of judicial economy.  Certification of this class will achieve one of the fundamental objectives of F.R.C.P. art. 23(b)(3), namely allowing numerous claimants to unite and sue together when prosecution of their individual claims would otherwise be impractical.

83.

The Named Class Representatives further aver that if this class is certified, sufficient notice can be provided to the Putative Class to satisfy the requirements of F.R.C.P. art. 23(c)(2)(B) by mailing notices to class members based on the mailing addresses which the Louisiana Department of Wildlife and Fisheries already has for its licensed commercial fishermen and crab trap licensees.  In the event that some licensees' addresses are not current, notice can also be provided through publication in relevant newspapers.

**FIRST CAUSE OF ACTION (LIABILITY UNDER LA. C.C. ARTS. 2317 AND 2317.1)**

84.

Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if fully copied herein *in extenso*.  Each allegation herein is made individually, in the alternative.

85.

The Deepwater Horizon and the oil well in the Macondo Prospect are located on the outer Continental Shelf off the coast of the state of Louisiana.  The Outer Continental Shelf

Lands Act (OCSLA), 43 U.S.C.§1331 *et seq.,* mandates that disputes involving structures erected on the shelf are governed by the laws of the adjacent state to the extent not inconsistent with other federal laws and regulations.

86.

Plaintiffs aver that Defendant Transocean and/or the Lease Defendants had ownership and/or garde over the 450-ton, 40-foot-tall BOP which was fitted over the source of the oil well.

87.

The BOP had a vice, ruin and/or defect which presented an unreasonable risk of harm. Plaintiffs aver that the BOP's failure (which resulted in the explosion, burning, collapse and sinking of the Deepwater Horizon), constitutes a "ruin" as that term is contemplated by La. C.C. article 2317 and 2317.1.  Specifically, Plaintiffs aver that on information and belief, the "ruin," defect or vice of the BOP included its blind shearing rams which were unable to: (1) slice through the pipe used in this well at this depth; (2) slice through pipe joints; (3) detect pipe joints immediately; and/or (4) otherwise immediately stop the flow of oil into the Gulf.

88.

On information and belief, in the event of an emergency (which the BOP is designed for use during), engineers aboard the rig on information and belief were unable to determine immediately whether the shear ram was aligned with a joint. Therefore, if at the time of an explosion, the shear ram was aligned with a joint or was otherwise unable to cut through the pipe, the shear ram was effectively useless based upon its design and construction.

89.

The Lease Defendants and/or Transocean had actual and/or constructive knowledge

of the BOP's vice, ruin and/or defect and did not take corrective measures within a reasonable amount of time. Specifically, on information and belief, Defendants knew or with the exercise of reasonable care, should have known that the BOP could not cut through this pipe and/or joints in the pipe, and thus if the BOP was activated, particularly if it was activated when the shear ram was aligned with a joint in the pipe, the ram would be unable to slice through the drilling pipe.

90.

Plaintiffs further aver that Transocean and/or the Lease Defendants knew or should have known that the BOP had another defect insofar as it could not be remotely controlled and/or acoustically activated.

91.

Plaintiffs further aver that Transocean and/or the Lease Defendants knew or should have known that the rig was also not equipped with operational double-redundancy systems to shut off the flow of oil and/or gas in the event of an emergency.

92.

Plaintiffs further aver that the damage could have been prevented by the exercise of reasonable care, and Transocean and the Lease Defendants failed to exercise such reasonable care. Plaintiffs aver that the BOP's shear ram could have been constructed so that it could cut through the pipe used at this well at this depth and further so that the ram could cut through the joints in that pipe. Plaintiffs further aver that Transocean and the Lease Defendants could also have employed acoustically-activated, double redundancy systems.

93.

In the alternative, Plaintiffs aver that the BOP had to be proven prior to drilling to be

effective on the drilling pipe to be used on this rig, and further, it had to be routinely and regularly tested in the field. Plaintiffs aver that the BOP should have been tested under field, not laboratory, conditions to determine if it could cut through the drilling pipe used for this well at this depth. On information and belief, such field testing under actual conditions was never performed.

94.

In the alternative, to the extent that Transocean and/or the Lease Defendants failed to properly maintain the BOP, Defendants are liable for the damage which resulted. Specifically, Defendants exercise custody and control over the BOP, and they are charged with keeping it in such a condition of repair that the BOP and well will not be dangerous to other persons or their property.

95.

The BOP's vices, ruin and/or defects caused the damages suffered by Plaintiffs and the Putative Class insofar as it failed to stop the flow of oil into the Gulf.  The damage incurred by Plaintiffs and the Putative Class occurred through the unreasonable risk of injury posed by the BOP.

96.

Transocean and the Lease Defendants are thus liable under La. C.C. art. 2317 and 2317.1 which impose an obligation upon the owner(s) and/or custodians of a "thing," in this case the BOP.

97.

Plaintiffs aver that the failure of the BOP and the ensuing explosion, burning, collapse and sinking of the Deepwater Horizon were not caused by an irresistible force or a force that

is not usually foreseeable.

98.

Plaintiffs' damages and those of the Putative Class were due to no fault of their own.

99.

Transocean and/or the Lease Defendants were in a better position than the innocent victims herein to guard against the unreasonable risks posed by the BOP.

## SECOND CAUSE OF ACTION - PRODUCTS LIABILITY

100.

Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if fully copied herein *in extenso*.  Each allegation is made individually, in the alternative.

101.

Plaintiffs, on behalf of themselves individually, and alternatively, the Named Class Representatives on behalf of the Putative Class, make the following claim under the Louisiana Products Liability Act, R.S. § 9:2800.51, *et seq.*

102.

Defendant Cameron, as the designer and manufacturer of the BOP, is liable to Plaintiffs and alternatively to the Putative Class for damage proximately caused by the failure of the BOP to operate as intended and prevent the spill after the explosion.

103.

Plaintiffs aver that the BOP was unreasonably dangerous at the time it left Cameron's possession and/or control in the BOP's construction, composition and/or design. Specifically, the BOP was designed and/or constructed in such a way that it was unable to effectively stop

the flow of oil from the rig after the explosion.

104.

On information and belief, in designing the BOP, Cameron did not use the best and most appropriate models available to calculate the necessary force and did not adjust the force to differing types of pipes used in drilling at this depth, according to a study by WEST Engineering for the MMS completed in September 2004. As a result, on information and belief, the BOP was defectively designed, a fact that was known or should have been known to Cameron, Transocean, and/or the Lease Defendants.

105.

Alternatively, on information and belief, this BOP's shear ram was designed and/or engineered in such a way that it was unable to cut through pipe used at this depth and/or the joints which intermittently connect pieces of drill pipe. In addition, in the event of an emergency (which the BOP is designed for use during), engineers aboard the rig on information and belief were unable to determine quickly whether the blind shear ram was aligned with a joint.  Thus, the shear ram was effectively rendered useless based upon its design and construction because it could not cut through the pipe intended for use here, it could not cut through pipe joints which are commonly occurring, and it could not detect if it was aligned with a pipe joint.

106.

 Alternatively, there existed at the time of the BOPs' manufacture, other feasible designs for BOPs, including but not limited to shearing rams able to cut through joints and/or the pipe used at this depth, as well as acoustically-activated, remote-controlled, dual-redundancy systems, which also may have been able to control the flow of oil and prevent

32

the spill in an event such as this.  If the BOP failed to activate due to other reasons other than the sheared ram's inability to slice the pipe, an acoustically-activated, remote-controlled, dual-redundancy system could have been used to activate the BOP.

107.

The system as designed and manufactured by Cameron, on information and belief with the knowledge and/or approval of Transocean and/or the Lease Defendants, failed to prevent the spill and thus failed to prevent the ensuing economic and other damage to the ecosystem.  Cameron was in a better position than the innocent victims herein to guard against the unreasonable risks of blow-out and oil spillage from the rig due to the BOP's defective design and/or construction.

108.

Further, the gravity of the damage to the ecosystem and the livelihoods of Plaintiffs far outweighed the cost to Cameron as the manufacturer to adopt, design, construct and implement an alternative design incorporating not only a double-redundancy shut-off system that could be acoustically activated and/or otherwise operated remotely but also shear rams which could slice through pipes and tool joints used in this case and/or which could determine quickly where the pipe joints were in the event of an emergency.

109.

In addition, because the shear rams destroy drill pipe if and when they are used in an emergency, on information and belief, Cameron's testing of the shear rams only involved testing whether they would move and whether they complied with formulas, but not whether they would actually cut the drilling pipe as calculated. Thus, Cameron's design and construction of the shear rams was defective as Cameron had not documented with certainty

that the shear rams could and would operate as intended in the field at the depths at which the Deepwater Horizon was drilling.

110.

Plaintiffs further aver that Cameron knew or should have known that the rig was not equipped with remote-controlled, acoustically activated double-redundancy systems to shut off the flow of oil and/or gas in the event of an emergency, and/or that the BOP was designed based on inadequate models that were not adjusted for differing types of pipe including joints. On information and belief, Cameron further knew or should have known that the BOP and its shear ram had never been adequately tested in the field and thus might fail in the event of an explosion.

111.

Plaintiffs aver that the explosion and ensuing spill could have been prevented by the exercise of reasonable care in designing and constructing back-up systems, testing and properly designing and constructing the BOP and specifically the blind shear ram, and in properly constructing, implementing, and maintaining all of the Deepwater Horizon's safety and containment systems.

112.

In the alternative, Plaintiffs aver that Cameron is liable to them and to the Putative class insofar as it failed to provide adequate warnings regarding the use of a single system (the BOP) at the depth the BOP was used here, and regarding the use of the blind shear rams, and regarding the use of additional safety equipment and/or equipment that was remotely controlled and/or acoustically activated.

## THIRD CAUSE OF ACTION - (NEGLIGENCE AND/OR GROSS NEGLIGENCE)

113.

Plaintiffs, on behalf of themselves individually, and alternatively, the Named Class Representatives on behalf of the Putative Class, repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if copied herein *in extenso*. Individual allegations are made herein in the alternative.

114.

The fire, explosion and resulting oil spill were caused by the negligence and/or gross negligence of the Defendants.

115.

Defendants owed a duty to Plaintiffs and to the Putative Class to refrain from actions that caused damage to the natural resources, marine and coastal ecosystems, and marine and wildlife of Louisiana which Plaintiffs use and enjoy. Defendants further owed a duty to refrain from damaging the livelihoods of the respective class members.

116.

Upon information and belief, Plaintiffs aver that the fire, explosion and resulting oil spill were caused by the negligence, gross negligence and/or fault of the Defendants in the following non-exclusive particulars:

a     Failing to properly design, engineer, and/or operate the Deepwater Horizon and/or the BOP so that they performed in a safe manner;

b.    Operating the Deepwater Horizon, its equipment, and the BOP in such a manner that a fire and explosion occurred, causing the Deepwater Horizon to sink and resulting in an oil spill;

c.    Failing to properly inspect and/or maintain the Deepwater Horizon, its equipment and the BOP to assure that the rig, its equipment, and the BOP were fit for their intended purposes;

d.      Acting in a careless and negligent and/or grossly negligent manner
        without due regard for the safety of others;

e.      Failing to promulgate, implement and enforce rules and regulations and
        equipment pertaining to the safe operations of the Deepwater Horizon
        and the BOP;

f.      Failing to implement doubly-redundant safety mechanisms and procedures
        which, if they had been so promulgated, implemented and enforced, may have
        averted the fire, explosion, sinking and oil spill or lessened it;

g.      Operating the Deepwater Horizon with personnel who were not properly
        and sufficiently trained and/or licensed personnel in the operation of the
        rig and/or emergency procedures;

h.      Inadequate and negligent training and hiring of personnel;

I.      Failing to take appropriate action to avoid or mitigate the accident;

j.      Negligent implementation of policies and procedures to safely conduct
        offshore operations in the Gulf of Mexico, including but not limited to the
        extraction of mud prior to setting the final cement plug and the use of
        new cement that may have exacerbated the production of heat or
        otherwise failed;

k.      Failing to ensure that the Deepwater Horizon incorporated all safety
        equipment available to the industry in doubly-redundant systems, free
        from defects and/or in proper working order sufficient to address the
        drilling pipe and conditions in which this rig operated;

l.      Failure to timely warn;

m.      Failure to timely bring the oil release under control;

n.      Violation of federal and/or state statutes and/or regulations and/or drilling
        outside of the parameters outlined in the MMS leases;

o.      Violation of company and/or governmental protocols, guidelines and policies,
        including but not limited to the extraction of mud prior to setting the final cement
        plug;

p.      Failure to provide appropriate accident prevention equipment including but not
        limited to doubly redundant, acoustically and/or remotely activated BOPs and/or
        other safety mechanisms that were working properly and as intended;

q.      Failure to properly and timely observe and monitor procedures and/or

36

failure to properly and timely observe, monitor and/or read gauges that would have indicated excessive pressures in the well;

r.    Failure to properly and timely react to danger signs;

s.    Failing to test and/or fully test the BOP and other safety equipment to ensure the equipment was working properly;

t.    Failing to repair and/or replace the non-functioning or malfunctioning equipment in a timely manner;

u.    Conducting cementing operations improperly;

v.    Failing to employ alternative cementing operations in light of known problems with the cementing operations that were employed;

w.    Acting in a manner that justifies imposition of punitive and/or statutory damages;

x.    Failing to provide all reasonable cooperation and assistance requested by responsible officials in connection with clean-up, containment, and removal of oil; and,

y.    Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the laws of Louisiana and Federal law applicable on the outer Continental Shelf.

117.

The injuries to Plaintiffs and the Putative Class were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations and failed to take necessary actions to mitigate the damage caused by their actions and inactions after the explosion.

118.

In addition and in alternative, the use of the dispersants in the quantities that were used here and at the depths dispersed here without prior experience and with total disregard to the environment constitutes gross negligence, or in the alternative, negligence.

119.

In addition to the negligent and/or grossly negligent actions described above, and in the alternative thereto, the injuries and damages suffered by Plaintiffs and the Putative Class were caused by the acts and/or omissions of the Defendants that are beyond proof by the Plaintiffs and the Class Members, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the fire, explosion, sinking and oil spill resulted from the negligence and/or gross negligence of Defendants. Furthermore, the fire, explosion, sinking and resulting oil spill would not have occurred had the Defendants exercised the high degree of care imposed on them, and Plaintiffs therefore plead the doctrine of *res ipsa loquitur*.

120.

Plaintiffs and the Putative Class are entitled to a judgment finding Defendants liable to Plaintiffs and to the Putative Class for all damages suffered as a result of Defendants' negligence and/or gross negligence and awarding Plaintiffs and the Putative Class adequate compensation therefor in amounts determined by the trier of fact.

## FOURTH CAUSE OF ACTION - (OIL POLLUTION ACT)

121.

Plaintiffs, on behalf of themselves individually, and alternatively, the Named Class Representatives on behalf of the Putative Class, repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if fully copied herein *in extenso*. Each allegation is pled in the alternative.

122.

Plaintiffs, on behalf of themselves individually, and alternatively, the Named Class

Representatives on behalf of the Putative Class, make the following claim under the Oil Pollution Act, 33 U.S.C. §2701 *et seq.* ("OPA").

### 123.

The OPA, 33 U.S.C. §2701 *et seq.,* and specifically 33 U.S.C. §2702, imposes liability upon a "responsible party for a...facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the "damages... that result from such incident."  Those damages include, pursuant to §2702(b)(2)(E) "damages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant," including Plaintiffs and the Putative Class herein.

### 124.

In addition, Section 2702(b)(2)( C) of the OPA provides for the recovery of "[d]amages for subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."  Further, Section 2705(a) provides that a claimant may recover pre-judgment interest.

### 125.

Plaintiffs aver that Defendants herein are "responsible parties" as that term is defined in the OPA, and/or Defendants are engaged in contractual relationship(s) with a "responsible party" as that term is defined in the OPA. *See,* 33 U.S.C. §2701(32) and 33 U.S.C. §2702 (d)(1)(A), *et seq.*  Because all Defendants are either responsible parties and/or are engaged in contractual relationships with responsible parties, Defendants are liable to Plaintiffs and the Putative Class under the OPA.

39

126.

Plaintiffs specifically aver that Defendants did not exercise due care and/or did not take all precautions against foreseeable acts and omissions by their own employees, agents, and/or by third parties. Plaintiffs further specifically aver that on information and belief, Defendants BP and Transocean resisted the implementation of new precautionary measures proposed by MMS and thus did not take all precautions available in the industry against foreseeable acts and/or omissions.

127.

Alternatively and to the extent that Defendants resisted, avoided and/or refused to implement every and all reasonable safety precautions and measures to avoid this disaster as proposed by MMS and/or as available in the industry, Defendants' actions constituted willful misconduct, and thus the limitations of liability do not apply

128.

Plaintiffs further specifically aver that on information and belief, Defendants BP and Transocean failed to provide proof that the BOP could shear the drilling pipe to be used on the Deepwater Horizon, in violation of federal regulations.

129.

Alternatively and to the extent that Defendants resisted, avoided and/or refused to take all reasonable safety precautions and measures to avoid this disaster including proving that the BOP would work as intended, Defendants' actions constituted willful misconduct, and thus the limitations of liability do not apply.

130.

Plaintiffs further alternatively aver that the limitations of liability contained in 33 U.S.C.

§2704 do not apply in this instance insofar as the acts of Defendants as recounted herein which caused loss and damage to Plaintiffs and the Putative Class were the result of gross negligence on the part of Defendants, including, but not limited to, on information and belief: (1) the extraction of mud before the final cement plug was set contrary to good industry practices; (2) the use of a BOP that was not fully tested, that was not sufficiently designed, constructed and/or maintained, and/or that was not proven to be capable of shutting off the flow of oil and/or gas; (3) the failure to use doubly-redundant systems and/or acoustically-activated, remote control systems; and, (4) the use of dispersants and other methods post-explosion which damaged the environment.

131.

Moreover, Plaintiffs aver that Defendants did not provide all reasonable cooperation and assistance as requested by responsible officials, and as required by the OPA. Specifically, BP attempted to secure the assistance of commercial fisherman, shrimpers and crabbers in oil clean-up and/or containment efforts as requested by responsible officials. However, BP initially attempted to condition the chartering of the fishermen's vessels upon the execution of waivers drafted by or on behalf of BP. Later, BP attempted to condition the assistance of these vessels and crews upon the execution of a Master Vessel Charter Agreement drafted by BP with language requiring the vessel owners to provide to BP with notice of any claims the owners may have or may have had against BP within thirty days.

132.

BP's requirement that vessel owners, commercial fishermen, shrimpers and crabbers execute documents that could impact upon their legal rights constituted a lack of cooperation and assistance by BP to the extent that BP's requirements caused delays and/or reticence

among some of those BP was asked to retain to assist in clean-up and/or containment

efforts. To the extent that BP's requirements of waivers or other documents caused

unnecessary delays in oil clean-up and containment efforts, Plaintiffs aver that BP failed to

provide all reasonable cooperation and assistance requested by responsible officials and thus

the limitations of liability provided in §2704 do not apply.

133.

BP's practices in attempting to secure waivers were condemned as "unacceptable" by

U.S. Secretary of Homeland Security Janet Napolitano in an interview on "Good Morning

America" on May 3, 2010, and the federal government promised action if BP did not

voluntarily stop the practice. Although BP's Chief Executive Officer Tony Hayward stated that

BP had stopped the practice, calling it an "early misstep" during an interview on "Good

Morning America," that did not erase the delays caused by BP's own actions and lack of

fervent cooperation in attempting to limit its own liability.

134.

Further, to the extent that Defendants, or any of them, as responsible parties and/or

agents/parties in contractual privity with responsible parties, violated any federal safety,

construction or operating regulation(s) on the Deepwater Horizon, as to the BOP, and/or after

the explosion, the limitations of liability contained in 33 U.S.C. §2704 do not apply.

135.

The Coast Guard has not yet named the parties responsible for this explosion and

spill. It is believed that BP will be named as a responsible party, and BP's Chief Executive

Officer, Tony Hayward, stated publicly shortly after the spill that "We [BP] are taking full

responsibility for the spill and we will clean it up and where people can present legitimate

claims for damages, we will honor them. We are going to be very, very aggressive in all of that".

136.

In that regard, Plaintiffs have made claims against BP as contemplated by the OPA.

137.

However, Plaintiffs aver that BP has effectively denied its liability for the full extent of those claims in its public statements made thereafter. Specifically, Mr. Hayward indicated on May 3, 2010 that BP's responsibility was for clean-up only, and that liability for economic damages might be the responsibility of others including Transocean. During an interview with news anchor Meredith Vieira for the Today Show, Mr. Hayward stated that, "It wasn't our accident...the drilling rig was a Transocean drilling rig. It was their rig and their equipment that failed, run by their people, their processes."  In addition, a statement from BP spokewoman, Michele Davis, after Hayward's comments stated that *"BP is responsible for cleaning up the spill,* and is taking that responsibility very seriously. *The cause of the leak is something for a later investigation.*"  Finally, in a meeting on May 4th with Senator Bill Nelson of Florida, BP executives including Hayward implied that BP would contest paying the full extent of economic damage claims.

138.

Plaintiffs aver in the alternative that BP's actions and inactions constitute a denial of liability for the full extent of the claims made by Plaintiffs herein and those of the Putative Class insofar as BP is asserting that the liability for those claims (as opposed to liability for clean-up costs) rests with Transocean and/or others and/or that BP's liability is capped at $75 million.

139.

Plaintiffs further aver in the alternative that if BP's actions and statements are not deemed to be an effective denial of Plaintiffs' claims, in the event that BP later affirmatively denies those claims or part of them, Plaintiffs assert a claim under the OPA.

140.

Plaintiffs aver that all Defendants are liable pursuant to 33 U.S.C. § 2701 *et seq.,* directly and/or vicariously, for all damages that result from the oil spill incurred by Plaintiffs and the Putative Class herein, unlimited in any way.

141.

As a result of the oil spill, Plaintiffs and the Putative Class have not and will not be able to use natural resources (air and water, and wetlands and other areas and spaces that have and/or may become contaminated/effected by the spilled oil) for their commercial crabbing business and/or their subsistence, and thus, they are entitled to recover from Defendants for such damages in amounts to be determined by the trier of fact.

142.

As a result of the oil spill, Plaintiffs and the Putative Class have suffered the type of damages that may be recovered pursuant to Section 2702(b)(2)(E), and they demand compensation therefor from Defendants in amounts to be determined by the trier of fact.

143.

In addition to damages, Plaintiffs and Putative Class are entitled to pre-judgment interest on their claims pursuant to Section 2705(a) and Section 2705(b) of the OPA and therefore demand same.

## FIFTH CAUSE OF ACTION - THE OIL SPILL PREVENTION AND RESPONSE ACT AND/OR TORTIOUS INVASION OF A PUBLIC RIGHT

144.

Plaintiffs, on behalf of themselves individually, and alternatively, the Named Class Representatives on behalf of the Putative Class, repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if fully copied herein *in extenso*. These allegations are made in the alternative.

145.

Defendants are liable to Plaintiffs and to the Putative Class for damages as provided in the Oil Spill Prevention and Response Act (LOSPRA), La. R.S. 30:2451 *et seq*. and for tortious invasion of a public right, specifically the right of commercial crab fishermen who routinely operate in the Gulf of Mexico and Louisiana's coastal waters to make commercial use of those waters.

146.

Plaintiffs aver that the wrongful conduct, and the resultant damage to the commercial fishing industry and the crabbing industry in particular, occurred in the Gulf of Mexico.

147.

Plaintiffs aver that there has been a tortious invasion of commercial fishing, crabbing, and shrimping areas by the introduction of pollutants and contaminants including the spilled oil and the dispersants. Specifically, the oil spill constitutes an interference with the direct exercise of the public right to fish, crab, and shrimp enjoyed by Plaintiffs and the Putative Class, and as a result, Plaintiffs and the Putative Class have incurred economic losses.

148.

Plaintiffs and the Putative Class, as commercial crab fishermen, have suffered

damages greater in degree than those suffered by the general public at large.

## JURY DEMAND

### 149.

Plaintiffs and the Putative Class demand trial by jury on all matters so triable that are pleaded herein.

**WHEREFORE**, Plaintiffs, on behalf of themselves individually, and the Named Class Representatives on behalf of the Putative Class pray for judgment in their favor against Defendants, jointly, severally and in solido, as follows:

a.      An order certifying the Class for the purpose of going forward with any one or all of the causes of action alleged herein; appointing Ronald A. Kreger, Sr. and Charles Schmalz as Named Class Representatives; and appointing undersigned counsel as counsel for the Class;

b.      Economic and compensatory damages in amounts to be determined at trial, but at least in an amount in excess of $5 million, along with interest as provided by statute;

c.      Punitive and statutory damages as allowed by law;

d.      Pre-judgment and post-judgment interest at the maximum rate allowable by law;

e.      Attorney's fees and all costs of this litigation;

f.      Such other legal, equitable and other relief available under all applicable state and federal laws and any relief the Court deems just and appropriate;

g.      A trial by jury as to all Defendants and as to all claims so triable.

RESPECTFULLY SUBMITTED:

  /s/ Karen D. McCarthy
LANNY R. ZATZKIS, T.A. (Bar #13781)
KAREN D. McCARTHY (Bar #14193)
YVETTE A. D'AUNOY (Bar #22761)
ZATZKIS, McCARTHY & ASSOCIATES, L.L.C.
650 Poydras Street, Suite 2750
New Orleans, Louisiana 70130
Telephone:  (504) 523-2266
Facsimile: (504) 593-9921
Attorneys for Plaintiffs

**SERVICE VIA**:

REQUEST TO WAIVE SERVICE OF A SUMMONS PURSUANT TO F.R.C.P. 4(d)